UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES D. CHADWICK,

                                  Plaintiff,

      vs.                                                      9:05-CV-975
                                                           (GLS/GJD)
SGT. MICHAEL MONDOUX, et al.,

                                  Defendants.
_____

JAMES D. CHADWICK
Plaintiff pro se

GREG T. JOHNSON, ESQ.
SCOTT P. QUESNEL, ESQ.
Attorneys for Defendants

GARY L. SHARPE, United States District Judge

## MEMORANDUM DECISION and ORDER

     In this civil rights complaint, plaintiff alleges that defendants violated his constitutional rights when they failed to protect him from assault by a known enemy. (Dkt. No. 1). Plaintiff also alleges that defendant Mondoux failed to provide plaintiff with a grievance form so that he could file a complaint. Plaintiff seeks "to be compensated." Plaintiff also appears to seek some sort of injunctive relief.

     Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 28). Plaintiff has *not* responded to

defendants' motion.[1]  For the following reasons, this court agrees with defendants and will dismiss the complaint.

## DISCUSSION

**1.     Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*.

**2.     Facts**

The complaint in this action is not very specific regarding the facts surrounding the incidents in question.  However, the defendants have submitted a great deal of information, clarifying the complaint.  Plaintiff claims that on May

---

[1] In fact, it appears that plaintiff has failed to inform the court of his change of address. Defendants advised the court that they were unable to serve their motion on plaintiff because he was no longer at the address that he had provided the defendants. (Dkt. No. 30)

22, 2005, while an inmate in B-Pod[2] of the Washington County Jail, he was involved in an "altercation" with three other inmates, one of whom was Mark McKoy.[3]  Plaintiff blames the altercation on defendant Mondoux because although Mondoux was allegedly "informed" that there was a "problem" in B-Pod, he failed to "resolve" the problem.  Plaintiff states that after Corrections Officer Bump intervened to stop the fight, inmate McKoy was removed from the housing unit.  Plaintiff states that a few weeks later, he was moved to the Special Housing Unit[4] (SHU) for an unrelated incident.

Plaintiff states that during the time that he was in SHU, inmate McKoy was returned to B-Pod.  On June 13, 2005, plaintiff was also returned to B-Pod.  Plaintiff states that defendants Undersheriff Matt Mabb and Lieutenant George Smith, decided to put plaintiff back in B-Pod without considering plaintiff's safety.  Plaintiff claims that during the evening of June 13, 2005, defendant Martell was "playing games" on the computer instead of watching the inmates on the Pod, when inmate McKoy assaulted plaintiff, causing him to suffer an injury below his

---

[2] Although plaintiff refers to his housing area as B-Unit, all the defendants refer to the housing area as B-Pod.  It is clear from defendant Smith's affidavit that these terms are interchangeable. Smith Aff. ¶ 2.  For consistency, this court will refer to the area as B-Pod.

[3] Plaintiff spells this name "Makoy," however, the court will use the correct spelling of this inmate's name.

[4] SHU is a unit used to segregate inmates from the general population, often for disciplinary or administrative reasons.

3

eye requiring stitches and severe pain in his neck.[5] Plaintiff claims that defendant Martell failed to pull the "duress pin" and did not come over to see if plaintiff needed help for five to seven minutes after the incident.

Finally, plaintiff alleges that he requested a "grievance" from defendant Martell, who referred plaintiff to defendant Mondoux. Defendant Mondoux allegedly told plaintiff that the situation was "not grievable."

In support of their motion for summary judgment, defendants have submitted the affidavits of Corrections Officer Bump, Corrections Officer Martell, and Lieutenant George Smith. Defendants have also submitted the transcript of plaintiff's July 18, 2006 deposition, his response to defendants' request for admissions, other documents relating to these incidents, and a DVD of the assault itself.

In his affidavit, Officer Bump states that on May 22, 2005, he witnessed an altercation involving four inmates. Bump Aff. ¶ 2. The fight initially involved inmates Donni Adams and Darren Sylvester. *Id.* During the fight between Adams and Sylvester, inmate McKoy joined the fight and began trying to kick inmate Adams while he was on the ground. *Id.* Officer Bump attempted to break up the fight, and as he was trying to do so, plaintiff Chadwick joined the altercation and hit inmate McKoy. *Id.* All inmates were separated and given either 24 or 48 hours

---

[5] Plaintiff states that he was able to "talk his way out of" becoming involved in a physical altercation.

of "keeplock." *Id.* Inmates Adams, Sylvester, and McKoy were sent to SHU for 48 hours, while plaintiff remained on B-Pod.[6] *Id.*

Officer Bump filed an incident report, which has been included as Defendants' Exhibit F. The incident report notes that inmate McKoy had been "locked in" by Officer Ray earlier in the day for refusing to "lock-in." Plaintiff was charged with fighting and received 24 hours of keeplock as a penalty. Defendants' Exs. G, H. Officer Bump states that he does not recall inmate McKoy or any other inmate threatening plaintiff after the fight with retaliation of any kind. Bump Aff. ¶ 3.

Officer Martell states in his affidavit that he was ***not*** working on May 22, 2005, so he did not see or hear the altercation. Martell Aff. ¶ 5. Defendant Martell states that on June 13, 2005, he was at his observation post, entering data into his computer when another inmate told him that "something" had happened between two inmates. *Id.* ¶ 6. When defendant Martell looked up from his desk, he saw inmate McKoy arguing with plaintiff who was seated at one of the day-room tables. *Id.* Officer Martell told McKoy to return to his cell, and defendant Martell locked McKoy's cell door from the observation post. Defendant Martell states that at that time, there was no need to pull the duress pin because there was no active fight occurring, and he did not fear for his own or any inmate's safety. *Id.*

---

[6] There appears to be a small inconsistency between Officer Bump's affidavit and the documents attached. Officer Bump states that only inmates Adams, Sylvester, and McKoy were taken to SHU, while the records state that "all inmates were taken to SHU." *Compare* Bump Aff. ¶ 2 *with* Bump Aff. Ex. G. This inconsistency does not affect this court's decision.

Defendant Martell states that after locking inmate McKoy's cell, Martell walked over to plaintiff, who was still seated at the table, approximately fifty feet away from Officer Martell. *Id.* ¶ 7. Defendant Martell states that he observed that plaintiff had a cut below his eye and asked plaintiff if he needed medical attention. *Id.* Plaintiff stated that he did need attention, and defendant Martell called the shift sergeant on duty, who arrived minutes later to take plaintiff to get medical assistance. *Id.* Defendant Martell completed an incident report. *Id.* ¶ 9, Ex. B. Inmate McKoy was charged with assaulting plaintiff and received a disciplinary penalty. Martell Aff. Ex. B at 2.

Defendant Martell also states that plaintiff never asked him for a grievance form, and even if he had, Martell would not have been able to comply with that request since in February of 2005, the grievance policy at Washington County Jail had changed. Martell Aff. ¶ 14, Ex. A. Exhibit A is a copy of a memorandum to all inmates, dated February 11, 2005 regarding the grievance procedure. This memorandum indicates that grievance forms will no longer be distributed by the housing unit officer, but must be obtained from the shift sergeant. *Id.* The memorandum further outlines the procedures that inmates were required to follow when they had complaints. *Id.*

Defendant Martell also states that prior to the incident of June 13, 2005, he was not aware of any animosity between plaintiff and inmate McKoy. *Id.* ¶ 10. Plaintiff had ***never*** mentioned to defendant Martell that he was afraid of any

6

inmate, nor did he request protective custody, an option that was available to all inmates who believed that they were in danger. *Id.* ¶¶ 11-12. In fact, in his affidavit, defendant Smith notes that the reason that plaintiff went into SHU after the May 22, 2005 incident was that plaintiff was being investigated for threatening to stab another inmate. Smith Aff. ¶ 3. The administrative segregation order is attached as Exhibit C to defendant Smith's affidavit.

Plaintiff did ultimately file a grievance regarding the assault incident. In that grievance he also complained about inmate access to grievance forms. Smith Aff. ¶ 4, Ex. D. As a result of that grievance, the grievance policy at the facility was changed to make grievance forms "more available to inmates in the future." *Id.* at 2-3. On June 20, 2005, a memorandum was sent to all sergeants and grievance officers stating that inmates would not have to participate in an "informal grievance process." *Id.* Ex. E.

At his deposition, plaintiff testified that when he was released from SHU and went back to B-Pod, he saw inmate McKoy, and they spoke to each other. Quesnel Aff. Ex. L, Chadwick Dep. at 60. Plaintiff stated that McKoy told plaintiff that he did not want any problem. *Id.* That evening, plaintiff was sitting at a table speaking with one of his friends when he saw inmate McKoy walk by, but plaintiff stated that he did not think anything of it. *Id.* at 60-61. Plaintiff stated that he did not think that McKoy was going to harm him, instead, McKoy came up behind plaintiff and punched him in the head. *Id.* at 61. Plaintiff testified, however, that

when he saw McKoy earlier on June 13, 2005, he was not afraid that McKoy would strike him. *Id.* at 62.

Plaintiff testified that McKoy hit him in the back of the head, and plaintiff's head slammed down on the table, causing the cut on plaintiff's face. *Id.* at 67-68. Plaintiff stated that he did not strike inmate McKoy in return and in fact, did not say anything to him because plaintiff did not want any trouble. *Id.* at 68. At the deposition, plaintiff and defense counsel viewed the videotape recording of the incident. *Id.* at 78-79. Plaintiff admitted at the deposition that even after he saw McKoy, he never told anyone that McKoy was a threat or asked to be moved to a different housing area. *Id.* at 102, 109. The court has also viewed the DVD of the incident.

### 3.  **Respondeat Superior and Municipal Liability**

It is well-settled that the personal involvement of a defendant is a pre-requisite to the award of damages in a section 1983 action. *See Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001). Liability may not be based on the theory of *respondeat superior*. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id*. A supervisory official is said to have been

8

personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id*. Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id*. Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id*.

The above case law is applicable to a consideration of whether the supervisory officials would be liable ***individually*** for damages in a section 1983 action. With respect to holding these individuals liable in their ***official*** capacity and thus, establishing municipal liability[7], or suing the municipality itself as plaintiff has done, plaintiff would have to show that the allegedly unconstitutional conduct resulted from a "policy" or "custom" of the municipality. *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).

When a claim against a municipality is based upon actions of subordinates such as in this case, municipal liability will be determined by plaintiff's ability to attribute the officer's conduct to the actions or omissions of higher ranking officials with policymaking authority. *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).

One method of attributing conduct to the municipality is for plaintiff to show

---

[7] An ***official capacity*** suit is essentially a suit against the municipality by which the individual is employed. A section 1983 action against municipal officers in their official capacity is treated as an action against the municipality itself. *Coon v. Town of Springfield*, 404 F.3d 683, 687 (2d Cir. 2005)(citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)).

that the policymaker was aware of the subordinates' unconstitutional actions and consciously chose to ignore them, effectively ratifying the actions. *Id.* (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)). Thus, where the policymaking official shows "deliberate indifference" to constitutional violations caused by subordinates, such that the official's actions rise to the level of a "deliberate choice", then that acquiescence may be considered the municipality's policy or custom that is actionable under section 1983. *Id.* (citing *City of Canton Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Jeffes v. Barnes*, 208 F.3d 49, 63 (2d Cir. 2000)(holding that a sheriff's acquiescence in unconstitutional retaliation could be inferred from his tolerance and encouragement of harassment of plaintiffs)). The Second Circuit also stated in *Amnesty America*, that because a single action on the part of a ***policymaker*** is sufficient to create a municipal policy, then "a ***single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability***." 361 F.3d at 127 (emphasis added).

In this case, plaintiff names five defendants, including two supervisory officials and Washington County as a separate defendant. There is no indication that either of the supervisory officials, Lieutenant Smith or Undersheriff Mabb had ***any*** involvement in plaintiff's case. There is no allegation either that they were aware of the initial altercation or the subsequent problem with inmate McKoy. Although plaintiff seeks to hold them responsible because they should have

reviewed his file and determined that they could not place plaintiff on the same housing unit with McKoy, there is absolutely no evidence the either of these defendants had anything to do with plaintiff's or McKoy's placement in B-Pod.

Plaintiff has also failed to meet any of the other prerequisites for personal involvement outlined in *Williams v. Smith.* As stated above, there is no evidence that either of the supervisory officials were aware of the initial incident. Plaintiff joined in the initial fight after it had started, and at his deposition, stated that when he saw McKoy on B-Pod on June 13, 2005, plaintiff was *not* afraid of inmate McKoy. Chadwick Dep. at 62. Plaintiff *never* told anyone that he had seen McKoy or that he was afraid of McKoy and wanted to be separated from the inmate.[8] The supervisory officials could not have "corrected" the situation after the second incident since there was no longer anything to correct. Additionally, although defendant Mondoux was present on May 22, 2005, he was not present on July 13, 2005. Defendant Martell was not present May 22, 2005, and was not even aware of the initial altercation. Thus, there is no evidence that the supervisory defendants were grossly negligent in managing their employees or that the supervisory officials condoned unconstitutional behavior.

With respect to Washington County itself, plaintiff has neither alleged, nor shown that there was a policy or custom attributable to the County that caused the

---

[8] The assault on plaintiff did not happen until later in the evening on June 13, 2005, and plaintiff testified that he had seen McKoy in the afternoon of July 13. Chadwick Dep. at 60-61. The time of the incident is listed on the incident report as 20:45 (8:45 p.m.). Martell Aff. Ex. B).

11

alleged violation. This was an isolated incident, and plaintiff never told anyone that he was afraid of inmate McKoy. In fact, plaintiff testified at his deposition that when he and McKoy spoke to each other on June 13, prior to the incident, the "both basically said [they] didn't want no [sic] problem and were just trying to do the time to go home . . . ." Chadwick Dep. at 62. There is absolutely no basis for finding a custom or policy sufficient to establish municipal liability. Thus, this case must be dismissed as against defendants Mabb, Smith, and Washington County.

**4.    Failure to Protect**

An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.'" *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir. 1991)(citation omitted). An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. *Id.* at 113. In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm

12

exists and the defendant must also draw that inference. *Id.*

In this case, the only allegation that plaintiff makes against defendant Mondoux is that he failed to resolve a "problem" on May 22, 2005, and that this "failure" was the cause of the first altercation. This claim is completely unsupported, and even if defendant Mondoux failed to resolve a "problem," the court would point out that defendant Mondoux could not have had any idea that the "problem" involved or could have involved plaintiff.[9] The May 22, 2005 altercation did not involve plaintiff until he joined the fight when he saw inmate Adams being kicked.[10] Thus, plaintiff was an aggressor during the first altercation, and Mondoux could certainly not have been aware of any "risk" to plaintiff at that time.

There is no indication that either defendant Mondoux or defendant Martell had any responsibility for returning McKoy to B-Pod or for placing plaintiff in B-Pod after his return from SHU. Because defendant Martell was not present on May 22, 2005, he was completely unaware of the first altercation. Martell Aff. ¶ 5. It is thus, unclear how defendant Martell could have been deliberately indifferent to an excessive risk because he was not aware of any risk, and plaintiff never mentioned

---

[9] Plaintiff testified that the "problem" involved inmate McKoy's shoes. Chadwick Dep. at 30-31, 88-89. Inmate McKoy was missing his shoes, and believed that plaintiff's friend Donni Adams was responsible. *Id.* at 30. According to plaintiff, defendant Mondoux laughed at McKoy and told him that he should not have left his shoes on the basketball court. *Id.* at 30-31.

[10] Plaintiff admitted this fact in his response to defendants' request for admissions. Quesnel Aff., Ex. K, Plaintiff's Admissions ¶ 7. Chadwick Dep. at 32.

13

it to him, although he had several hours to do so.[11]

Although the complaint seems to state that defendant Martell was not paying attention to his duties when the assault on plaintiff occurred, Officer Martell clearly states that he was entering information into his computer, and another inmate alerted him that there was "something" going on.[12] The video tape of the incident indicates that Officer Martell approached plaintiff only minutes after the incident.[13] Defendant Martell states that he asked plaintiff if he needed medical assistance and went to call the Shift Sergeant so that plaintiff could get treatment for his injury. Martell Aff. ¶ 7.

Defendants have met their burden of showing that there is no genuine issue of material fact with respect to plaintiff's claim for failure to protect. Plaintiff has not responded to the summary judgment motion and has previously admitted most of the facts as stated by defendants.[14] Thus, plaintiff's Eighth and Fourteenth Amendment failure to protect claim is dismissed as against all defendants.

---

[11] Plaintiff admitted that after learning that inmate McKoy was in B-Pod, plaintiff never express concerns about inmate McKoy to *any of the defendants*, nor did he attempt to sign himself into protective custody. Plaintiff's Admissions ¶¶ 32-35, 51-56.

[12] Any claim that defendant Martell was "negligent" in failing to observe the incident would not be actionable under section 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

[13] Plaintiff admitted that defendant Martell approached plaintiff minutes after the incident and that after five more minutes, Sergeant Mondoux arrived to take plaintiff to the hospital for treatment. Plaintiff's Admissions ¶¶ 60-61.

[14] Plaintiff's Admissions. Quesnel Aff., Ex. K. The request for admissions has been filed as Exhibit J to the Quesnel affidavit.

**5.** **Improper Grievance Procedures**

Courts have consistently held that because grievances procedures are undertaken voluntarily by the New York and other states, they are ***not constitutionally required***. *See Ramos v. Hanslmaier*, 96 Civ. 744, 1997 U.S. Dist. LEXIS 6082, *6-7 (S.D.N.Y. Feb. 19, 1997)(multiple citations omitted). *See also Bullock v. Horn,* CV-99-1402, 2000 U.S. Dist. LEXIS 21573, *22-23 (M.D. Pa. 2000)(plaintiff claimed improper refusal to process grievance); *Hoover v. Watson*, 886 F. Supp. 410, 418-19 (D. Del.), *aff'd*, 74 F.3d 1226 (3d Cir. 1995); *Muhammad v. McMickens*, 86 Civ. 7376, 1988 U.S. Dist. LEXIS 552, *8-9 (S.D.N.Y. Jan. 25, 1988). Because the grievance procedures are not constitutionally required, a violation of those procedures or the failure to enforce them does not give rise to a claim under section 1983. *Id.*

In this case, plaintiff complains that he was not given a grievance form when he requested it, and he was told that the assault was not "grievable." Although as stated above, the failure of defendants to properly follow grievance procedures does not rise to the level of a constitutional claim, defendants have in fact, responded to plaintiff's claims. Defendant Martell states that in February of 2005, the grievance procedure had been changed to provide that grievance forms would no longer be available from the housing unit officers. Martell Aff. Ex. A. A memorandum regarding the change in procedure was posed for "ALL INMATES." *Id.*

15

The memorandum further stated that before an inmate was given a grievance form, he had to first address the complaint to the housing unit officer, who would attempt to solve the problem himself. *Id.* If the housing unit officer was unable to resolve the problem, he would contact the shift sergeant to attempt to resolve the issue. Finally, if the shift sergeant was unable to resolve the issue, the inmate would be given a grievance form and would receive a response from the grievance officer. *Id.* This appears to be an attempt at requiring inmates to engage in an "informal" resolution of their grievances prior to filing a formal complaint. Under this new procedure that was in effect at the time of the incident, plaintiff would not have initially been given a grievance form.

However, on June 30, 2005, plaintiff filed a grievance, in which he complained both about the assault ***and*** about the grievance procedure. Smith Aff. Ex. D. In his grievance, he requested that grievance forms be made readily available to inmates whenever they had what "they felt" was a grievable issue. *Id.* at p.1. The response to plaintiff's grievance regarding the availability of forms was positive. *Id.* at p.2. On July 7, 2005, Sergeant Hamilton responded that the grievance procedure had been changed by the facility to make these forms more available to inmates in the future. *Id.* at pp.2-3. The memorandum to the facility officers was dated June 20, 2005 and specifically stated that no inmate would have to follow "informal procedures" prior to being given a grievance form, and the inmate will be given the form within 24 hours of his request. Smith Aff. Ex. E.

16

Thus, in this case, plaintiff's due process claim, challenging the way his grievance was handled must be dismissed as against all defendants.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that defendants' motion for summary judgment (Dkt. No. 28) is **GRANTED**, and the complaint is **DISMISSED IN ITS ENTIRETY.**

Dated: September 28, 2007

*Gary L. Sharpe*
U.S. District Judge